MICHAEL SCULLANE *vs.* FREDERICK T. KELLOGG & another.

Hampden.    September 28, 1897. — November 24, 1897.

Present: ALLEN, HOLMES, KNOWLTON, MORTON, & BARKER, JJ.

*Personal Injuries — Employers' Liability Act — Master and Servant — Negligence — Due Care — Assumption of Risk — Law and Fact — Damages.*

In an action for personal injuries sustained by the plaintiff, while in the defendant's employ, by an elevator coming down upon him while he was picking up some papers which had been spilled from an upper story of the building on the bottom of the elevator well, if the defendant's superintendent sent the plaintiff there to do this work, and promised to look out for him while he was so engaged, the plaintiff is entitled to go to the jury upon the questions of negligence on the part of the superintendent, of due care on his own part, and of his assumption of the risk.

In an action for personal injuries sustained by the plaintiff, while in the defendant's employ, by an elevator coming down upon him while he was picking up some papers which had been spilled from an upper story of the building on the bottom of the elevator well, there was some evidence tending to show that the plaintiff had been responsible for the upsetting of the paper; that the defendant's superintendent came to the place where this had happened, and saw the plaintiff and others at work picking up paper; that his purpose was to have the entire matter remedied before he went away; that he knew that some of the paper had been spilled down the elevator well, and that the plaintiff was the person who had spilled it; that he knew that somebody would have to go down stairs and pick up the paper in the well; that he saw the plaintiff go off; that the plaintiff went down stairs and began to pick up the paper in the well; and that after some minutes, and before the superintendent himself went down stairs, the elevator was lowered and came down upon the plaintiff while he was at work there. *Held,* that there was sufficient evidence to entitle the plaintiff to go to the jury upon the question of the superintendent's negligence.

Although there is no distinct proof, in an action for personal injuries, of the amount of the expenses of the plaintiff's sickness or medical attendance, if it appears that a physician treated him eight times at the plaintiff's house and eleven times at his own office, an allowance by the jury of forty dollars is reasonable.

TORT, for personal injuries sustained by the plaintiff while in the defendant's employ. The third count of the declaration, upon which the case was submitted to the jury, was under the employers' liability act, St. 1887, c. 270, alleging negligence of some person in the defendant's service, intrusted with and exercising superintendence, whose sole or principal duty was that of superintendence.

Trial in the Superior Court, before *Dewey, J.,* who allowed a bill of exceptions, in substance as follows.

The plaintiff testified that, in February, 1896, he entered the employ of the defendants, who were envelope manufacturers; that he was a general workman, taking care of the paper in the room and bringing it up stairs; that the accident occurred on April 9, 1896, in the morning; that there was a steam elevator which ran from the basement to the top of the building; that on the morning of the accident there was a truck load of paper called flats dumped from the machine room floor, part of it on the elevator and part of it down the elevator well; that the paper came from the cutter on the machine room floor, which was the fourth floor from the cellar, there being five floors in the building; that the plaintiff and one Carney started to pick up the paper that was dumped on the elevator, and one Schofield, who, it was agreed, was the defendants' superintendent, "came around"; that "Schofield told me I would have to go down stairs and pick up that paper and straighten it out; he said I would have to go down into the elevator and straighten that paper out; I told him I would; I asked him if he would look out for me, and he nodded his head; I then went down there and started to pick up the paper"; that he went down into the basement and walked into the elevator well, the door of which was open, and began to pick up the paper, of which there were a good many thousand sheets, which were scattered over the bottom of the elevator shaft; and that he had been working there ten or fifteen minutes when the elevator came down upon him, and he received the injuries complained of.

On cross-examination, the plaintiff testified that he did not know whether, when Schofield told him to go down and pick up the paper, he spoke so that anybody could hear him or not; that he did not think that anybody else was around there at the time; that he was accustomed to use the elevator, but did not use it on this occasion because somebody else wanted to use it, and so he walked down the stairs into the basement; and that he did not see or hear the elevator, and had no warning that it was coming down.

Thomas H. Tracy testified that he was a physician and attended the plaintiff professionally after the accident; and that

he treated him eight times at the plaintiff's house and eleven times at his own office.

Thomas Eagan testified as follows : " On the day of the accident I was working for the defendants, and.my business·was to carry stuff up and down stairs on this elevator; after the paper had been spilled off the truck I took the elevator from the floor where the paper was dumped and started down to the basement. to get something; when I got within three or four feet of the basement floor, I heard some one hallo, and I stopped the elevator and jumped off; the elevator was stopped about three feet from the basement floor; the plaintiff got out and I went up stairs ; at the time I took the elevator from the third floor, I did not see Mr. Schofield around there anywhere ; I had no notice that the plaintiff was down in the cellar."

Harry Schofield testified, among other things, as follows : " At the time of the accident I was employed by the defendants as general superintendent of the factory ; the flats were spilled on the third story ; I came down stairs to the third story ; came along by the wall and walked over to the elevator.  I saw the plaintiff, with Miss Mahany and Carney, working around the elevator, picking up flats which had been spilled from the truck ; I could see this as I walked along; as I came along and got perhaps within fifteen or twenty feet of the people there, I saw the plaintiff get up, walk around the wall there, which was built out into the room ; I saw him go around that wall ; I saw what had happened.  I then went along to this archway to the cutters, to a man by the name of Goddard ; in consequence of what I said to Goddard, he came out with me ; after we got out there, we went to work and took the flats off the elevator, and then we commenced to pick them up off the floor, get them on to this truck, and Goddard and Carney then went to work and commenced to jack them up on this truck.  Then I went off to get off some orders, regular business; after I had done this businses I came back again.  I said something to Carney, in consequence of which he and I started on the elevator to go down cellar to pick up the flats that were in the well; the elevator at that time was on a level with the third floor ; I did n't know that the plaintiff had gone down to pick up the flats; I had n't spoken to him, and he had n't spoken to me at that time; Goddard got

on of his own accord ; we went down and picked up what flats there were. I saw the plaintiff down there standing in the middle of the floor, a little back, rubbing his shoulder ; I asked him what the matter was, and he said he got squeezed under the elevator ; I asked him what he was doing under there; he said he was picking up those flats, and that was about all that was said. If a man is down in the elevator well where the plaintiff was, picking up these flats, when the elevator is coming down, and gets so that the elevator platform is even with the floor joists just above the cellar floor, that cuts the light off from the upper story in the elevator well ; with reference to what other way a man could tell whether the elevator was coming down or not, he could tell by the rope being pulled ; if a man is in that elevator well and the elevator is up on some floor above him, the noise of the starting of the elevator would indicate that it was being started and its coming down."

On cross-examination, he testified : " On this particular day, I had been working on the fourth story when the flats were spilled, and I came down to the third story, and I saw then that the flats had 'been spilled ; I went right straight toward the elevator ; when I started down I did not go there with the purpose of seeing what the matter was, but as soon as I saw it, I did ; my purpose was to have the entire matter remedied before I went away ; I could n't say whether any had been cleaned out of the elevator before I got there ; I knew who was in the habit of handling those flats ; I did n't ask who it was that spilled those flats as soon as I got there."

" Q. You knew it was the plaintiff ? A. He was there, and had charge of that business. — Q. And you knew that he was the one that had spilled the flats ? A. Yes, sir. — Q. And you knew that flats had spilled down in the elevator well ? A. Yes, sir. — Q. As a necessary consequence ? A. Yes, sir."

He also testified as follows: " I saw the plaintiff go off. . . . I knew somebody would have to go down when I went away from there, at the end of seven or eight minutes, to pick those up in the well."

William Carney testified that he was in the employ of the defendants, and was helping the plaintiff on the day of the accident when the flats were spilled ; that the plaintiff, with Annie

Mahany and the witness, began picking up the flats; that he noticed that the plaintiff had gone away, although he did not see him go ; that about the same time he saw Schofield coming towards the elevator; that he did not hear Schofield say anything to the plaintiff at any time ; that Goddard came and assisted them in picking up the flats; that Schofield, Goddard, and the witness, by Schofield's direction, went down on the elevator to pick up the flats which were on the floor of the elevator well, and then found that the plaintiff had been injured ; that there were about a thousand flats on the floor, and it took them only two or three minutes to pick them up ; and that he did not see any that had been taken out before they got there.

Frank C. Goddard corroborated, in substance, the previous witness, and also testified as follows : " This elevator is a slow running, heavy freight elevator, and makes a great deal of noise as it runs ; you can hear it quite plainly as it goes up and down ; you can see the rod move down in the bottom of the elevator well when the elevator is started or stopped ; when the elevator is going down, and gets even with the floor above the basement, it shuts off the light which comes into the elevator well from the elevator door at that floor, and a person standing in the elevator well could see that the elevator was coming down by the shutting off of the light."

Thomas Moriarity testified, among other things, as follows : " On the day of the accident I was working for the defendants, and was engaged in making size in the basement at the time that the plaintiff came down ; he took a banana from his pocket, peeled it and ate it, and we stood there talking together for about ten minutes before he went into the elevator well ; the first thing I heard after that was somebody hallo, and I looked around and I saw the plaintiff under the elevator ; there were about a thousand flats in the bottom of the elevator well, and it would only take two or three minutes to take them out and jog them."

Annie Mahany testified as follows : " I was employed by the defendants ; on the day of the accident I saw the flats slide off the truck that the plaintiff and Carney were putting on to the elevator ; I went there to help pick them up, and a little while after I had got there I saw Mr. Schofield coming toward the

elevator from the direction of the stairs that lead up stairs; as he was going toward the elevator, the plaintiff started away; Mr. Schofield was about fifteen feet away from the elevator when the plaintiff started away; Mr. Schofield did not say anything to the plaintiff that I heard."

At the conclusion of the evidence, the defendants requested the judge to rule as follows:

" 1. There is no sufficient evidence that the superintendent, Schofield, was guilty of any negligence for which the defendants are liable, which caused or contributed to the plaintiff's injury. 2. If the jury find that the superintendent, Schofield, did not have the conversation with the plaintiff which the plaintiff says he did, in which he promised the plaintiff that he would look out for him, then there is no sufficient evidence that Schofield was guilty of any negligence which would render the defendants liable in this action. 3. Upon the pleadings and evidence, the plaintiff is not entitled to recover, because he himself was not in the exercise of due care. 4. Upon the pleadings and evidence, the plaintiff is not entitled to recover, because his injury was caused by one of the risks of the employment which he voluntarily and appreciatingly assumed. 5. Nothing can be recovered for expenses of sickness or medical attendance."

The judge refused to rule as requested.

The jury returned a verdict for the plaintiff in the sum of seventy-six dollars, of which forty dollars was for medical attendance; and the defendants alleged exceptions.

*W. Hamilton,* (*W. H. Brooks* with him,) for the defendants.

*W. H. McClintock,* (*J. B. Carroll* with him,) for the plaintiff.

ALLEN, J.  The first, third, and fourth requests for instructions were rightly refused.  The jury might find from the plaintiff's testimony that the defendants' superintendent had virtually promised to look out for him while he was picking up the paper in the elevator well; and if such promise had been given, the plaintiff was entitled to go to the jury upon the questions of negligence on the part of the superintendent, of due care on his own part, and of his assumption of the risk.  *Davis* v. *New York, New Haven, & Hartford Railroad,* 159 Mass. 532, 535.

A more doubtful question arises upon the second request. This request does not touch the question of the plaintiff's due

care, or of his assumption of the risk, but it presents the question whether, in the absence of any promise by the superintendent to look out for the plaintiff, there was any sufficient evidence of his negligence. Upon consideration, we think there was sufficient evidence to entitle the plaintiff to go to the jury on this question, even omitting the testimony of the conversation. That is to say, there was some evidence tending to show that the plaintiff had been responsible for the upsetting of the paper, that the superintendent came to the place where this had happened and saw the plaintiff and others at work picking up paper, that his purpose was to have the entire matter remedied before he went away, that he knew that some of the paper had been spilled down the elevator well and that the plaintiff was the person who had spilled it, that he knew that somebody would have to go down stairs and pick up the paper in the well, that he saw the plaintiff go off, that in point of fact the plaintiff went down stairs and went to work picking up the paper in the well, and that after some minutes, and before the superintendent went down, the elevator was lowered and came down upon the plaintiff while he was at work there. The jury might infer from this evidence that the superintendent knew or supposed that the plaintiff had gone down to do that which he actually did ; and they might think that he ought to have taken some precautions to prevent the elevator from being let down upon the plaintiff. On the whole, the court might properly refuse to give the second instruction.

The fifth request was also properly refused. Although there was no distinct proof of the amount of the expenses of sickness or medical attendance, yet, in view of the evidence as to the physician's services, the jury might allow a reasonable sum. In a proper case, even unascertained future expenses may be allowed for. *Turner* v. *Boston & Maine Railroad*, 158 Mass. 261, 267.

*Exceptions overruled.*